May it please the Court, I'm David Barry for the two judges who have not met me before. David Barry for the plaintiffs and appellants, Arlene Freeman and James Alexander. I was here two years ago arguing the case of Freeman v. San Diego Association of Realtors. Shortly after that case was remanded, we filed this case, based on acts that took place after the filing of the complaint in the San Diego Realtors case. And you promised to consolidate, right? I promise. I do not promise now, because the Freeman case is now over. You promised, or at least you made a representation. The reason you filed a separate case was the mandate hadn't come down, and you were facing a statute of limitations problem, and that as soon as you could, you'd consolidate. But was it ever consolidated? No, because it was dismissed before the – as I recall, it was dismissed before the spreading of the mandate before the district court. I see. Okay. So it began and continues its life as a separate case. In fact, by now, the Freeman case has been settled and dismissed, although there is a parallel case that's carrying on. We – that parallel case is not – Is this a case that never ends? I thought it was going to end it, but I was premature in that prediction. The issue that brings us here today is whether or not the egregious withholding of evidence in the first case can be the ground for a claim that those who held back the evidence What have you got really more than this cover violation, which was taken care of by the district court, that there was a sanctions order?  Isn't – isn't – why isn't that the end of the matter? Because of Theofil, Your Honor. Because of what? Theofil. I'm not – I'm not hearing you. Theofil. Theofil, T-H. Oh, Theofil. The case of Theofil. Everybody's using initials nowadays. I thought you were doing us initials. I get lost with initials, personally. I need a real name. Theofil, okay. And we called Mr. Theofil's lawyer, and he tells us how to pronounce it. In this – this Court decided Theofil very shortly after our district court dismissed this case. And in Theofil, there had been an egregiously overbroad subpoena, which was itself brought to the attention of that district court, which issued sanctions against that overbroad subpoena. The parties whose privacy was invaded by that subpoena then filed suit. And the defense raised there was the same as here, which is we have a constitutional right under North Pennington to do this. That is, we're engaged in a lawsuit, the kind of petition activity, and anything we do is okay. The most you can do is give us some sanctions, discovery sanctions, if we do things that are way outside what attorneys traditionally do. Now, in Theofil, the Court expressed some skepticism about whether subpoena inactivity is even petitioning activity. But the Court was willing to accept for argument that it could be petitioning activity, but said even so, you can be liable for invasion of privacy. So that is the answer. And Theofil completely disposes of the notion that once they pay the price in the discovery sanction, they're free to accept whatever benefits and whatever wrong flows out of that action. So your theory is that by withholding this information, they extended the monopoly for another year? Is that your claim? Part of the claim. It did, in fact. Let me make sure I understand, so the factual credit can just go on the same page. So at some point, maybe after we issue the opinion, they go back and they try to change the system? I'm sorry. I missed the first few words. Say it again. At some point, maybe after we issue our opinion here, they go back and they try to change the system, the listing system? After the remand. After the remand. After we issue our remand opinion. In the first case, after the remand, yes. Yes, they did, in fact, change the system to end the illegal practice. That is correct. And fill in the facts from there, because I get a little confused. What is it exactly that they failed to disclose? When we sued them in state court in 1997, in state court action, the president of Santa Corp happened to be named Bill Stiegel. And he said, wow, Barry's right. The plaintiffs are right. We are fixing prices. We are hurting our MLS users. We are hurting Santa Corp itself. He was the president of Santa Corp. He said we should stop this evil practice. He said that to his colleagues only, to his directors of Santa Corp. And they authorized him to create a plan called the IntelliQuick. IntelliQuick. IntelliQuick plan, one word. And that plan would basically centralize MLS functions at Santa Corp. They wouldn't use these ridiculously overpriced service centers, they call them, where people buy their MLS services. It is not written in stone that you have to buy your MLS service from a service center. You could do it like AOL. There is no little retail branch where you buy AOL. You just deal with AOL direct. And that's what the IntelliQuick plan contemplated, is basically getting rid of these overpriced service centers. And the thing that Bill Stiegel thought was really great was he could do the same good job as they were and they would actually lower prices. That business plan was created during the year 1997. At the end, when it was all drafted and his board of directors approved it and was ready to launch it, they had to, because of contractual agreement, they had to get the approval of the various boards of realtors who were going to get cut out of business. You have to get consent of the pigs before you slaughter them? Yep. That's what the contract said. So this guy went around and made his little presentation. And they said oink. Coronado kind of said, well, maybe if all the other pigs go along with it, we'll go along with it, too. But since all the others disapproved it, it was nixed. All this is now top secret between competing enterprises. They said, we're going to keep a secret. And more or less within the month of the day in December 1997, when I argued this in front of the state trial court, the lawyers told the judge, these corporations are incapable of conspiracy. Their interests are so unified that they cannot conspire as a matter of law. Well, that was a complete hoax. They had just sat through these presentations where Santa Corn, Bill Stigall, said to these boards of realtors, we're going to slaughter you because you're fixing prices, you're hurting Santa Corn, you're hurting the user. And these lawyers sat through the presentations, and then they told the judge exactly. Associations were the owners of Santa Corn, right? At that time, Santa Corn was owned entirely by the associations, and its board of directors was made up of representatives from the association. Correct. They're all corporations. The boards of realtors are non-profits, and they own shares in Santa Corn, which is itself a corporation. It's a domestic stock corporation, potentially could earn profits. So the argument they were making at that time sounds like the same argument they made with a distinct lack of success before the previous panel of this Court some years later. That's correct. By which time everything you're complaining about here with IntelliQuip was on the table. Correct. They still made the same argument. Yes. So hiding that evidence really didn't affect their ability to make the argument, although – and there's nothing in the decision, which Judge Kaczynski will fill us in on in more detail later if necessary, but I don't see anything there that suggests that IntelliQuip had anything to do with it. So I'm not entirely sure what it is that's being hidden here. It was hidden from the district court where we lost entirely. This case shouldn't have been over a long time ago. It wasn't. We just took this case right across the street to the federal court, put on the same facts, essentially the same theory in the federal courts, and we're going to give you a shot at some discovery. And the result was everything came out, not all at once. We were set up for summary judgment at a certain point when we discovered the big lie. We went to the district court. We got a discovery ruling, a sanctions order, a finding of egregious conduct. We were allowed a whole lot of new discovery. And it wasn't until a year later that the summary judgment was teed up again and was decided by Judge Lorenz, including the ruling that they're too closely interwoven to have the ability to conspire. This came to this panel. But everything was held back by one year. But we know. I didn't hear. I mean, this is being made like it's the nuclear secret. And when the secret came out, you still lost in the district court. And ultimately, you won here. But the reasons seem to have nothing to do with the nuclear secret. That was a matter of choice by this court. And this court had lots of evidence to choose from. In fact, the Intelliquid was an unimplemented plan. But it held things back by one year. Well, I look at the opinion previously issued by this court. And it recites a history that notes the representatives considered two different business models on which to operate the new common database. The notion that you could have a so-called decentralized model, that doesn't strike me as any big revelation. Now, granted, I'm looking at it some years hence. But again, what is it about Intelliquid that suddenly turned this case upside down and justifies characterizing the current defendant's conduct as being part of a price-fixing conspiracy, as opposed to being reprehensible discovery abuse? Because it radically changes the rules. It means if I'm a party in a case, I can withhold anything I want to, as long as I'm willing to pay the sanctions. Are you familiar with California's litigation privilege? Yes. Yes. How does that get into this mixture? Everything that's done in federal court. The Civil Code section 47 provides a protection for activities conducted within the litigation process. I think it's very similar to North Pennington protection. I think that is 47 is a statutory dimension. North Pennington is a constitutional dimension. But I think the activities protected, if you list them out, I think are identical. And the activities here, that is withholding evidence in an egregious way, subverting perjury, intimidating witnesses, those are outside the traditional area of what lawyers do in conducting their cases. And that's what North Pennington and Civil Code section 47 all are related to, which is what are the traditional duties and behaviors of attorneys in advocating their case. We all know that attorneys are free to advocate an erroneous point of law if there's any good faith basis to argue that point. That is, we're allowed to lose. In fact, half the people that show up here lose. Half win, half lose. That's just the math. We all know those things. But once you step out of the cocoon of traditionally protected activities and engage in crime, and that's what we're alleging here, you lose that protection. That's what Theofil said. Well, you may have a cause of action for criminal behavior. What turns that into a cause of action for price fixing? Because it is an aid of a price-fixing conspiracy. We cite a variety of cases in our brief where conduct that traditionally would not be expected to injure competition was in fact considered to be part of a price-fixing conspiracy because that was the purpose of it. That's why it so often happens that people in price-fixing conspiracies hide evidence. Yes, Your Honor. Well, here's where we lost you. You didn't finish your narrative. You got some time. But, okay, so they don't disclose. How does that tie into your price-fixing? So they don't disclose. I'm making quite a broad argument, although I don't have to win that broad argument to win the case. I just want to understand what your claim is. These are little nonprofits who can't pay the amount of damages. They can't pay all they stole. So when they extend this case by a year. They say these. Who are you talking about? The Association of Realtors. So when the case gets prolonged by one year because of this wrongful conduct, they overcharge, as we alleged, another $2 million that they never can repay. So it's a very factual, practical matter. There's $2 million. If this whole clock had gone forward with the summary judgment as originally planned, we would have won the case a year earlier and they would have stolen $2 million less. That's the relation. Your claim is that if this evidence had been disclosed, that would have given you summary judgment? Oh, no. Because we know that Judge Lorenz rejected it. So explain to me how things would have played out if the disclosure had been made. The case would have ended a year sooner. Why? How? Settlement? Oh, no, it didn't settle. But how would it have ended a year earlier? Summary judgment didn't work. Just looking at the record. There were two summary judgments. The first one was scheduled. Everything was briefed. And then we discovered Intelliquid had been withheld. We filed a motion under Rule 56 saying stop the summary judgment. We need new discovery. And the judge granted that. And then because of the way things work, it took a whole year before all the new discovery was in and it set for a new summary judgment. A year went by. Maybe that's your fault, then. You're the one that asked for the delay. Yes, I did. Maybe that's – does that make you part of a price-fixing conspiracy because your actions caused the thing to be delayed for a year? I mean, you could have let the summary judgment go forward then, lost, got to the Ninth Circuit, and won a year earlier by this theory. I didn't break any laws. I didn't violate – I didn't do anything indiregently. And I didn't commit any crimes. The point – there is a factual – I'm still not following your argument. I don't understand how it would have ended a year earlier because you won on summary judgment a year later. I lost in the district court a year later. Yeah, that's – and so how – You lost a year earlier. So I'm not following how you would have won a year earlier when you lost a year later when you had the stuff that you did a year earlier. I would have lost in the district court a year later. I would have lost in district court a year earlier. Right. I would have come to the Ninth Circuit. Right. I would have gotten the same decision, I believe, but it would have been a year earlier. And the wrongful conduct would have – Wow, I mean, we're getting so far afield from antitrust law, it's unbelievable. Holy Moses, that's an antitrust kind of a theory? The theory is – the answer is yes, that is an antitrust theory. I would have lost a year earlier, been able to come to the Ninth Circuit, get a Ninth Circuit opinion in the case that – You've got some causation problems here, too, don't you, if that's your concatenation of events that create your right to recovery in an antitrust lawsuit? That is the concatenation of events in this case that supports our claim for one year's worth of damages, but our claim is broader than that, Your Honor. I would have lost a year earlier. We're going – we actually go beyond that, Your Honor. I would have gone on a different panel and lost. Yeah, this is the Ninth Circuit. I realize there's a mix, although it was unanimous and I – and the on back was no one was interested in that, so I believe that we would have gotten the same result. But, Your Honor, our claim is broader than that. We're saying that when attorneys criminally hide evidence, they can be deemed to have joined the conspiracy as co-principles. That's the principle we argue for. What's the case that says that? We cited several. You've got about three minutes left. Do you want to say anything about it? What's your best case that says that? At about page 12 of our brief, we cite several, including CONMAR, where – CONMAR against Mitsui. Well, as I understood the cases that you cited, they have to do with somebody who can aid in a bet without performing the criminal act, but you can link that person to the intent of the conspiracy. Yes. That's sort of the mirror image of that. You can point at people that did what you consider to be criminal acts, but their linkage to the price-fixing conspiracy, what is it? It's hiding of evidence. In fact, it occurs commonly. That's what we cite in our opening case. It's common to find evidence hidden in price-fixing cases. We're saying it's so important in price-fixing conspiracies that when you do agree, it's the agreement we focus on, when you agree to hide evidence, you become liable as a co-principal. And I'll reserve my balance. Thank you. Good morning. May it please the Court. Jeffrey Showitt, DLA, Piper, Rudnick, Gray-Curry, on behalf of the defendants' respondents. The plaintiff in this case, the appellant in this case, has set a very high bar for himself because he's pled claims that invoke three separate and independent doctrines that, for policy reasons, require heightened pleading requirements, strict scrutiny at the earliest stage to protect against other important policies. Three. The first is the litigation privilege, which has constitutional dimensions to it. It requires that in this case it's based on their claim that prior litigation is the basis for wrongful conduct that they are entitled to a remedy for in this case. The second doctrine is they're not just suing litigants about litigation. They're suing lawyers who defended their clients in that litigation, and that invokes important policy considerations under the Tillamook principle and Norr Pennington. And it also requires a heightened pleading requirement, careful scrutiny, no reliance on equivocal conduct for inferences, specific allegations to show an entitlement to relief. In addition, it's an antitrust case. So the third standard is antitrust, and antitrust has specific standing requirements. Antitrust laws are not laws of general applicability. They are not super tort laws. They are limited to conduct that specifically threatens monopolies or involves concerted action that has the potential to harm competition. So they've got this high bar, and how do they satisfy it? What's the basis in their pleading to overcome this? Well, they allege nothing more than in the course of responding to discovery, not any event by which the defendants initiated anything to advance some interest outside the interest of defending the litigation. Responding, and that's important on the theophile distinction, which I'm going to address in a moment. But in the course of responding to the ----  Theophile, same thing, right? Go ahead.   I'm not going to use any initials, I promise you that. In the course of responding to discovery requests, remember, the response to a discovery request is not a proceeding by which the person responding advances any interest. We always tell our clients, you can't win a deposition, you can just break even. In the course of responding to those requests, and at least according to the allegations, making some poor judgments and violating discovery rules for which they were sanctioned. Making poor judgments, that's a bit of an understatement. Go ahead. I've got clients, and I don't want to be too hard on them, but the point is, let's accept the facts in the case. Let's accept that they were perjurious, criminal in nature, which itself is a conclusion. They were in the course of the litigation. They were participation in the litigation contest. And I think an analogy is useful here. And I'd like to make an analogy to a football contest, which is also a hard-fought contest in which people hit each other hard. Now, if you hit people while the whistle hasn't blown, that's what you're supposed to do. If you hit the quarterback after he released the ball, you hit him hard, you get a penalty for unnecessary roughness, but you're still trying to win the game. If you hit the quarterback out in the parking lot, I think you commit an assault. Tonya Harding. Yeah, Tonya Harding is a good example there, too. Now, if you hit the quarterback over the head with your helmet while he's lying on the ground because you don't like him and he said something bad about you, that's kind of like the sham exception to Norah Pennington, isn't it? It's not to play the game. It's not to advance the interests of the contest. It's to do something totally outside the contest for improper purposes. Well, maybe then you've won the game because you got rid of a bad quarterback. But but the point the point I'm making is this is a penalty for unnecessary roughness or maybe more appropriately, it's it's it's it's a pass interference on an uncatchable pass because the intelligent. All right. Well, maybe I'm carrying the analogy too far. All right. I'm sorry. I'm OK. Well, I don't know that if you knock out the quarterback or the side that that you you you will be ahead in the game. Well, my point to my point here is, yes. Isn't that essentially what happened here? No, it's not in the awful. I mean, if you want to use your analogy, I mean, if you if you hide the ball and to hide the ball, extend the litigation for a year. You've extended your monopoly for a year. Well, that's a fact whether whether whether whether what the legal consequences from that are that remains a fact. Well, if it turns out at the end of the litigation that what you were doing was price fixing and you managed to keep that litigation going. extends further and further out until you reach an end, you continue with a monopoly. So the effect of extended litigation is to extend the monopoly. Well, is it not? Isn't that a fact? You could you could probably draw a rather dotted line to those particular consequences and possibly get from the point A to point B. But antitrust has a standing line means I I'm asking you if you're engaging in illegal conduct and you can keep the finding that the conduct is illegal, you can postpone it. You can then continue doing what you've been doing until the day of reckoning. And if you can extend the day of reckoning out far enough, you extend your conduct out far enough. Isn't that maybe so? Maybe so, Your Honor. But under the claim, it's certainly a claim. It's certainly something that somebody could say, look, by hiding the ball in the litigation, they gave themselves another year of monopolizing. It doesn't pass the antitrust standing specific causal requirements. Because they have a standing. We found it in the first place. You've now just added conspirators. The connection between the conduct and the that was engaged in and the advancement of the anti-competitive goals is too remote and disconnected. Direct. You knocked the quarterback with your helmet over your head and you have now caused the game to swing the other way because you've knocked out the quarterback. You have caused illegally the case to continue for another year. You've bought yourself another year of monopoly. Remember what civil litigators say, justice delayed is justice, right? Well, you know that. I would disagree respectfully that under Prince under the Associated General Contractor test, which measures the causal connection between the conduct and the antitrust defense, which was a nice circuit case that was decided by the Supreme Court, they articulated two requirements. First of all, the causal connection between the alleged wrongful conduct and the harm to competition has to be direct, not remote, and non-speculative. What could be more direct than delaying the day of reckoning by, you know, you pay your lawyers to keep the ball up in the air, avoid the day of reckoning so we can enjoy the fruits of this illegal conduct for another. It's the most common thing in the world. You know clients do this all the time. First of all, we're dealing with a case in where those kinds of inferences based on these immunities are not to be taken from that kind of conduct. All they've alleged here is that there was discovery conduct, which they had the conclusion had that effect. But under the Knorr-Pennington and the immunities doctrine, well, no, these are not. The immunities require more than just conclusory allegations to reach those conclusions on which you based your question. But even if you reach them, my point is, under antitrust standing principles, under Associated General Contractors, where that causal connection is remote and speculative, where other causes could just as likely have contributed to the ill effect. And here, remember, his claim is that the withholding of this irrelevant piece of information, that is, information that had no bearing on any of the court's decisions that decided it. This case was decided on the application of law to undisputed facts. But because we withheld that and they chose it to make it a big issue in the case and extend the time, which could have just as easily been extended because the judge got sick or the jury got sick or counsel needed more time, there's a whole bunch of factors that contributed to court delay. To make court delay under those circumstances conduct that directly and non-speculatively causes harm to competition, I would suggest does violence to the antitrust standing requirement, which is a threshold requirement that throws this case out at the beginning as to all defendants, more importantly than the cause and fact requirement of standing. You have the antitrust injury requirement, and that requires that the injury flowing from the conduct be the type the antitrust laws envisioned and flow from the anti-competitive nature of the conduct. Here, the conduct is trying to win the lawsuit. Well, no, they're claiming that no, the conduct is trying to hide the ball. Well, they claim that's in the heads of the people that were doing it. But the objective conduct is responding to discovery. There can't be anything. She had a letter that documented that the allegations are correct, that is, that there's a discussion and the attorney says, you know, if we keep this ball hidden, we're going to be able to delay the final judgment for another year. And we're all going to make millions of dollars of profits as a result. So you get over the factual questions and the things that I think we're skeptical about with regard to the intent of the attorneys. Well, suppose you had those things. The injury ultimately suffered is from the price. I mean, the one being asserted by plaintiffs here is from the price fix. I'll answer that question in two parts. First, the latter question. I don't think no matter what evidence you had of the motive, you could overcome the standing problems with the remote connection between what was done and how it injured competition. But even if you could, I think that letter would overcome one element of the sham exception, and that would be that it was subjectively motivated for an improper purpose. But because it was not the initiation of the lawsuit under this Court's decision in Cottle and established Norr Pennington cases, the test is whether the misconduct actually deprived the underlying litigation of its legitimacy, not whether it delayed it a little bit, but whether the misrepresentations and the fraud, this is the third prong, it's this Court's decision in Cottle, whether it was so bad. Because remember, immunities are designed to protect wrongful conduct. We don't need immunities if there isn't some wrongful conduct that's being alleged to get over the immunity of Norr Pennington. The question is not whether there was bad conduct. We have to assume that there was. It's alleged. The question is whether the conduct, as alleged, deprived the underlying litigation of its legitimacy. Here we have counsel's admission on the record that after all the discovery that was done in the underlying case, he could put on a valid case, and he did. Whatever effect the withholding of this intellectual material had, it was ultimately discovered. He ultimately put it on the table. He lost the law, and he won up here. How could you say that the litigation was deprived of its legitimacy by reason of that conduct? And you must, unless you're going to create a brand-new exception to Norr Pennington. That does violence. That does violence to the decision in Cottle on established law. I want to comment, while I still have time, on what counsel started with, which I think is an important question, and I'm sure in the minds of the Court, how does this case differ from the Theofil case, which is this Court's decision where discovery misconduct did result in a — the immunity was disregarded? Important distinction between that conduct. There, the defendant initiated a third-party subpoena against a non-party. This Court, or our panel of this Court, found that that was transparently and egregiously baseless, and for no purpose other than to interfere with the business relationships of that third party. In other words, it wasn't to win the underlying case. It had nothing to do with the underlying case. It wasn't part of the defense of the underlying case. But the conduct was found, not alleged, but found to be for no purpose other than to initiate this baseless proceeding against the third party. That fits squarely within the first — well, the Court — this Court, a panel of this Court said, we're not sure that's petitioning conduct. But if it is, it meets the test of the sham exception for initiating proceedings because it's objectively baseless, they found, and subjectively motivated to do harm. They weren't playing the game, in other words. They were off in the parking lot, to use my analogy. Here, the only allegation is that we were responding to discovery. That's the character of the conduct. Oh, sure, it's alleged that it was wrongful, criminal, but it was part of our duties in the litigation to respond. You cannot infer from that conduct, at least you cannot infer exclusively, that that conduct was to advance any antitrust conspiracy. Its immediate and only effect was to prevent the plaintiff from getting information that he could use in a lawsuit to beat us. And we wanted to win the lawsuit, and that's what lawyers do. In other words, it was part of the defense of the case. It just went too far. We drew a penalty. We got flagged, and we had to pay a fine, a sanction. But we didn't step out of the litigation and engage in conduct that had no bearing in the litigation. We responded to discovery. That's all we did. We had to do that. Very different from what Theofil did. The defense in Theofil initiated an entirely new third-party proceeding to create mischief. And that was the distinction there. You asked counsel just before he sat down about the best case he had for showing that when lawyers engage in a conspiracy or help to suppress a conspiracy, they can become liable for it. He cited the Conmar case. That's just not. Conmar involved a case. It involved a – the issue there was whether the defense had fraudulently concealed information so as to extend the statute of limitations. It was not anything about joining the underlying conspiracy. It focused entirely on the fraudulent concealment basis for extending the statute of limitations. I'm going to sum up because the light says I have to, unless the Court has any questions. I talked a little bit about standing, and I think the point is whatever you think about the wrongful nature of this conduct, the egregious nature of it, and the immunities, it don't get out of the first box because it's just too remote speculative. If you look at the tests under associated general contractors, this doesn't meet those tests. You can't connect the dots between what we did and harm to competition in any way that meets the requirements of associated general contractor. The Tillamo cases, lawyers engaging in conduct requires that they step out of their role as advisers and become the makers of policy for their clients. Here, all they've alleged is that the lawyers engaged in discovery, misconduct in the course of discovery, but responding to discovery. They can't meet this heightened pleading requirement with those allegations. They put the conclusion that this was policy. But, for example, in the Spanish International case, which I wish was a Ninth Circuit case, but it's a Florida district case, but if that were a Ninth Circuit case, there'd be no question we would win. Because in that case, they said those conclusory allegations on the same-fax card are simply not a basis to allege that the lawyers stepped out of their role as counsel and made policy. It can't get there on those allegations. If, for example, they had alleged the lawyers owned some interest in the underlying company and sought to personally benefit from the fruits of the anti-competitive conduct, well, maybe then you'd get there. That's the kind of an allegation that it would take. And, of course, that's not present. The lawyers were doing what lawyers do. And, you know, maybe it's no secret, but lawyers sometimes get carried away. We try a lawyer, sometimes have big egos, and we really want to win really hard. And sometimes we cross lines, and discovery sanctions are available when that happens. But that's what happened here. Or, more importantly, there's not one allegation that would suggest, with the requisite level of certainty that they have to plead it, that it was other than that. That's the compelling inference from the conduct of this case. Thank you. Do you have a couple of minutes left for Butler? Thank you. I only want to address one issue. Counsel, again, tries to raise a straw argument that every time someone gets sick, if it delays the outcome of the case, that can be actionable. We do not claim any such thing. The claim is that there are very bright lines that the courts are well-equipped to administer. And we are addressing only things that are not routine discovery abuses, but crimes of the type described in this complaint are things that can be addressed by the courts, and remedies provided. Thank you.  Thank you. Okay. We'll stand some minutes. We'll hear an argument in the lounge.
judges: Kozinski, Trott, Clifton